# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAVIN M. RHODES,<br><br>          Plaintiff,<br><br>    vs.<br><br>M. ROBINSON, et al.,<br><br>        Defendant. | 1:02-cv-05018-LJO-DLB (PC)<br><br>FINDINGS AND RECOMMENDATIONS DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br>(Document 296)<br><br>**THIRTY-DAY OBJECTION PERIOD** |

Plaintiff Kavin M. Rhodes ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff filed this action on January 4, 2002.

After numerous appeals, a trial and significant law and motion practice, this action is now proceeding on Plaintiff's Third Amended Complaint ("TAC"), filed on June 9, 2011, for multiple claims of retaliation in violation of the First Amendment.  The remaining claims are: (1) Counts One and Two against Defendants Pazo, Tidwell, and Wenciker; (2) Count Three against Defendant Lopez; (3) Count Six against Defendant Chapman; (4) Count Eight against Defendants Todd and Lopez; (5) Count Ten against Defendants Lopez, Matzen, and Garza; and (6) Count Eleven against Defendant Lopez.

1

1    On August 5, 2013, Defendants filed this Motion for Summary Judgment.[1]  Plaintiff

2  opposed the motion on January 29, 2014, and Defendants filed their reply on February 20, 2014.

3  The motion is deemed submitted pursuant to Local Rule 230(*l*).

4  **I.    LEGAL STANDARD**

5    Any party may move for summary judgment, and the Court shall grant summary

6  judgment if the movant shows that there is no genuine dispute as to any material fact and the

7  movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks

8  omitted); *Washington Mutual Inc. v. U.S.*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's

9  position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to

10  particular parts of materials in the record, including but not limited to depositions, documents,

11  declarations, or discovery; or (2) showing that the materials cited do not establish the presence or

12  absence of a genuine dispute or that the opposing party cannot produce admissible evidence to

13  support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider

14  other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R.

15  Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir.

16  2001); accord *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

17    Defendants do not bear the burden of proof at trial and in moving for summary judgment,

18  they need only prove an absence of evidence to support Plaintiff's case.  *In re Oracle Corp.*

19  *Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S.

20  317, 323 (1986)).  If Defendants meet their initial burden, the burden then shifts to Plaintiff "to

21  designate specific facts demonstrating the existence of genuine issues for trial."  *In re Oracle*

22  *Corp.*, 627 F.3d at 387 (citing *Celotex Corp.*, 477 U.S. at 323).  This requires Plaintiff to "show

23  more than the mere existence of a scintilla of evidence."  *Id.* (citing *Anderson v. Liberty Lobby,*

24  *Inc.*, 477 U.S. 242, 252 (1986)).

25

26

27  ───────────────
[1]  Concurrently with their motion for summary judgment, Defendants served Plaintiff with the requisite notice of the
requirements for opposing the motion.  *Woods v. Carey*, 684 F.3d 934, 939-41 (9th Cir. 2012); *Rand v. Rowland*,
28  154 F.3d 952, 960-61 (9th Cir. 1998).

1    In judging the evidence at the summary judgment stage, the Court may not make

2  credibility determinations or weigh conflicting evidence, *Soremekun v. Thrifty Payless, Inc.*, 509

3  F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all

4  inferences in the light most favorable to the nonmoving party and determine whether a genuine

5  issue of material fact precludes entry of judgment, *Comite de Jornaleros de Redondo Beach v.*

6  *City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation

7  omitted), cert. denied, 132 S.Ct. 1566 (2012).  The Court determines only whether there is a

8  genuine issue for trial, and Plaintiff's filings must be liberally construed because he is a pro se

9  prisoner.  *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations

10  omitted).

11  **II.    SUMMARY OF PLAINTIFF'S ALLEGATIONS[2]**

12    Plaintiff is currently incarcerated at Kern Valley State Prison in Delano, California.  The

13  events at issue occurred in 2002 and 2003, while Plaintiff was housed at the California

14  Correctional Institution ("CCI") in Tehachapi, California.

15    *Counts One and Two*

16    Plaintiff alleges that on December 26, 2001, he placed the complaint in *Rhodes v.*

17  *Robinson* in the prison's Legal Mail Box.  On January 2, 2002, Defendants Pazo, Tidwell and

18  Wenciker approached Plaintiff.  Tidwell stated, "I know you filed a lawsuit."  Fearing for his

19  safety, and because he had not yet received confirmation from the Court, Plaintiff denied having

20  filed the action.  Plaintiff alleges that Defendant Tidwell tried to intimidate him and make him

21  turn over his only copy of the action.  Plaintiff refused to give them the copy, and Defendants

22  Pazo, Tidwell and Wenciker then went into Plaintiff's cell to search for the complaint.  They

23  could not find the complaint "amongst Plaintiff's voluminous amount of legal property."  TAC,

24  at 2.  Defendants then confiscated Plaintiff's carrying case for his CD player, sunglasses, AC

25  adapter, pens, pencils and writing tablets.

26

27

28  _____
[2] Only facts related to the remaining Counts will be set forth.

On January 3, 2002, Defendants Tidwell and Wenciker went to Plaintiff's cell door. Defendant Tidwell lied and told Plaintiff that he needed to escort him to the Unit Office because the Lieutenant wanted to speak with him. While en route to the office, Plaintiff saw Defendant Pazo walking towards his cell, pushing a large laundry cart. Plaintiff was not taken to see the Lieutenant, but was instead locked in "clinic holding" for several hours. When Plaintiff returned to his cell, he discovered that Defendants Tidwell, Wenciker and Pazo had confiscated all of his legal property in excess of three large boxes. They sent the legal property to R&R and it was not returned to Plaintiff. When Plaintiff submitted an appeal on the issue, it was assigned to Defendant Lopez, who was named as a defendant in the civil rights action.

Plaintiff alleges that these actions caused him to fear the exercise of his First Amendment right to petition the government for redress of grievances.

*Count Three*

On January 13, 2002, Plaintiff appeared at Classification Committee chaired by Defendant Lopez. Plaintiff alleges that Defendant Lopez fired him from his inmate job assignment as a SHU legal clerk in retaliation for naming him as a defendant and submitting an appeal related to his property.

Plaintiff states that the firing was done without explanation and caused Plaintiff to fear the exercise of his First Amendment right to petition the government for redress of grievances.

*Count Six*

Plaintiff appealed Defendant Lopez's retaliatory firing, and Defendant Chapman responded to the appeal with "further retaliations" by taking Plaintiff back to Classification less than thirty days after his January 13, 2002, appearance. Plaintiff alleges that Defendant Chapman put Plaintiff up for transfer, but as pretext, told Plaintiff that he could work in the main library. However, while working in the library, Plaintiff was constantly harassed by Defendants Tidwell and Pazo and was prohibited from doing any legal work. Plaintiff alleges that the transfer was subsequently cancelled.

On January 8, 2003, Defendant Chapman brought Plaintiff back to Classification to remove Plaintiff from the main library.  As Plaintiff got up to leave, he heard C. Nelson ask Defendant Chapman why Plaintiff was on single cell status.  Soon after, Plaintiff was evaluated by Dr. Keen.  Dr. Keen wrote a chrono for Plaintiff to retain his single cell status, but he told Plaintiff that he'd probably be transferred.

Plaintiff states that this conduct caused him to fear the exercise of his First Amendment right to petition the government for redress of grievances.

*Count Eight*

On February 27, 2003, Plaintiff was issued a false CDC-115 authored by Lt. Ramos for "Attempting to Cause Conditions Likely to Threaten Institutional Security."  On February 28, 2003, Plaintiff saw Defendant Lopez, who angrily stated, "You know who I am, and I know who you are.  The 115 is flemsy [sic] and you'll go to Committee on 3-6-03!"  TAC, at 9.

On March 4, 2003, Plaintiff received a revised copy of the 115, which listed the charge as "Threatening to Kill a Cellmate."  At Committee on March 6, 2003, Defendant Lopez admitted that he reclassified the 115, which Plaintiff alleges could lead to a lengthy SHU term.  At the hearing, Defendant Todd was extremely hostile to Plaintiff and threatened to have Plaintiff committed to a psychiatric facility if Plaintiff continued to file grievances.  Plaintiff alleges that up to that point, Defendant Todd had denied all of his grievances against Defendant Lopez.

Plaintiff states that this conduct caused him to fear the exercise of his First Amendment right to petition the government for redress of grievances.

*Count Ten*

On April 2, 2003, while Plaintiff was in the hole, Ad-Seg Sergeants Matzen and Garza, in retaliation for an appeal alleging misconduct against Defendant Lopez and other officers, came to Plaintiff's cell.  Defendant Matzen asked Plaintiff if he was sure that he wanted to proceed further with the appeal.  Defendant Garza was putting on his black leather gloves, trying to intimidate Plaintiff.  Plaintiff said that he wanted to continue with the appeal, and less than five seconds after they left, Defendant Lopez appeared at Plaintiff's cell, with Defendants Matzen

1 and Garza in tow.  Defendant Lopez shouted to Plaintiff to get out of his cell because he had

2 contraband, and threatened that if he didn't come out, they would drag him out and kick his ass.

3 Defendant Lopez told Plaintiff that he was getting a 115 and that he'd go back to Committee for

4 a transfer.  Plaintiff alleges that Defendant Lopez created conditions to justify a cell-extraction,

5 in retaliation for filing his grievance.

6      Plaintiff states that this conduct caused him to fear the exercise of his First Amendment

7 right to petition the government for redress of grievances.

8      *Count Eleven*

9      On April 4, 2003, Defendant Lopez had another officer fabricate a lockup order stating

10 that Plaintiff refused direct orders to exit his cell and be taken back to general population.

11 Plaintiff contends that this was done in retaliation for his appeal requesting that he be retained in

12 the hole to protect from further retaliation.  Plaintiff then received a false 115.  The first hearing

13 officer assigned to the charge refused to say that any direct orders were issued.  On May 22,

14 2003, Plaintiff was found guilty without any evidence.  On May 23, 2003, Plaintiff was

15 interviewed on an unrelated matter and the officer admitted that he after he wrote the 115, he

16 discovered that no direct orders had been given.  In the interim, Defendants Lopez and Todd had

17 taken Plaintiff back to Classification, in absentia, and released Plaintiff back to the general

18 population.  Shortly thereafter, Plaintiff received a fabricated Classification Chrono, dated April

19 3, 2003, and authored by Defendants Lopez and Todd, among others, stating that Plaintiff agreed

20 to the Committee's actions.

21      Plaintiff states that this conduct caused him to fear the exercise of his First Amendment

22 right to petition the government for redress of grievances.

23

24

25

26

27

28

1    **III.      UNDISPUTED MATERIAL FACTS**[3]

2           Plaintiff is an inmate in the custody of the California Department of Corrections and

3    Rehabilitation.  TAC, 1.

4           The events at issue occurred while Plaintiff was housed at CCI.  TAC, at 1.

5           *Counts One and Two*

6           On January 2 and 3, 2002, Plaintiff was housed in Facility IV-A.[4]  Ouye Decl. at 3.

7    Defendants Pazo, Tidwell and Wenciker were working as Search and Escort Officers in Facility

8    IV-A at CCI on January 2 and 3, 2002.  Pazo Decl. ¶ 1; Tidwell Decl. ¶ 1; Wenciker Decl. ¶ 1.

9           On January 2, 2002, Defendants Pazo and Tidwell searched Plaintiff's cell.  Defendants

10   Pazo, Tidwell and Wenciker had a regular practice of giving a cell search receipt for any

11   property confiscated from an inmate's cell, and they gave Plaintiff a cell search receipt for the

12   January 2, 2002, search.  Pazo Decl. ¶ 4; Tidwell Decl. ¶ 4; Wenciker Decl. ¶ 4; Pl.'s Decl. ¶ 10;

13   Pl.'s Opp'n Ex. 1.

14          Prior to the search, on December 26, 2001, Plaintiff alleges that he filed the complaint in

15   *Rhodes v. Robinson* by placing the complaint in the prison's legal mail box.  TAC, at 2.

16          The docket in this case indicates that the complaint was filed on January 4, 2002, and

17   entered by the Clerk on January 8, 2002.  ECF No. 1.  On April 19, 2002, the Court issued an

18   order authorizing service for Defendants Pazo, Tidwell and Lopez.  ECF No. 17.  Defendants

19   Pazo, Tidwell and Lopez were served on June 20, 2002.  ECF Nos. 23, 25 and 28.

20          Pursuant to Title 15 of the California Code of Regulations, sections 3190 and 3191,

21   unauthorized or unregistered property in an inmate's cell is subject to confiscation.  Brice Decl.,

22   Ex. B.

23

24

25

26   ───────────
[3] Facts which are immaterial to resolution of Defendants' motion for summary judgment, unsupported by admissible evidence, and/or redundant are omitted.  The Court also notes that many of Plaintiff's "facts" are actually arguments and do not constitute evidence.  *See Coverdell v. Dep't of Soc. & Health Servs.*, 834 F.2d 758, 762 (9th Cir. 1987).
27   [4] Plaintiff states that he was housed in Facility IV-B, but this appears to be a typographical error as all exhibits, including Plaintiff's, indicate that he was in Facility IV-A.

28

1     *Count Three*

2     Plaintiff went to Unit Classification Committee ("UCC") on February 13, 2002.  Ouye

3  Decl., at 8; Pl.'s Opp'n, Ex. 5.[5]

4     Plaintiff submitted an appeal relating to the February 13, 2002, UCC hearing on February

5  14, 2002, contending that Defendant Lopez fired him from his position as the IV-A SHU Legal

6  Clerk in retaliation for filing a lawsuit against him.  Pl.'s Opp'n, Ex. 6; Ouye Decl., at 47.

7     On March 18, 2002, Plaintiff received a Second Level Response.  Defendant Todd and

8  Chief Deputy Warden Sullivan denied the appeal, explaining that Plaintiff was not unassigned.

9  The reviewers determined that Plaintiff's supervisor was injured and unable to report to work for

10  several weeks, and Plaintiff reported that no one called him to work since the UCC hearing.  The

11  reviewers further explained that Plaintiff, a general population inmate, was working in the SHU,

12  despite a decision several months ago that no general population inmate should be assigned to

13  work in either the SHU or Ad-Seg.  Plaintiff was therefore relocated to the general population

14  library area where he would assist the SHU legal officer.  Ouye Decl., at 47.

15     *Count Six*

16     Plaintiff was taken to Committee on March 21, 2002, to be considered for a transfer to

17  California State Prison- Los Angeles County ("LAC").  Ouye Decl., at 9.  At the hearing,

18  Plaintiff was told that he met the requirements for 270 housing, a less restrictive environment,

19  and that CCI needed bed space in the 180 unit.  The officer also told Plaintiff that this transfer

20  would place him closer to his mother, who lived in Compton.  Ouye Decl., at 9; Chapman Decl.

21  ¶¶ 5, 6, 8.  Plaintiff was referred to the Classification Staff Representative ("CSR") for transfer.

22  Ouye Decl., at 9.

23     However, the transfer was ultimately cancelled by CSR on April 2, 2002, because LAC

24  was not available at that time.  Ouye Decl., at 10; Chapman Decl. ¶ 12.

25

26

---

27  [5] In his TAC and his Declaration, Plaintiff states that he went to Classification on January 13, 2002.  TAC, at 4;
Pl.'s Decl. ¶ 14.  However, copies of the UCC Classification Chrono submitted by both Plaintiff and Defendants

28  indicate that the date of the hearing was February 13, 2002.  Pl.'s Opp'n, Ex. 5; Ouye Decl., at 8.  In any event, it
does not appear that the date of the hearing is relevant.

1 The UCC is obligated by departmental policy to move inmates to less restrictive housing

2 when possible.  Chapman Decl. ¶ 7.

3 On January 8, 2003, Plaintiff came to Committee for annual review.  Ouye Decl., at 14;

4 Chapman Decl. ¶ 13.  Defendant Chapman was serving on the Committee.  Chapman Decl. ¶ 13.

5 At that time, clerks were subject to a nine month job rotation per policy.  Ouye Decl. at 13;

6 Chapman Decl. ¶ 16.

7 The Committee retained Plaintiff's A1/A work group/privilege status, which is the

8 highest level privilege group.  Ouye Decl., at 14; Chapman Decl. ¶ 14.

9 *Count Eight*

10 Plaintiff was placed in Ad-Seg on February 26, 2003, for the specific act of "Attempting

11 to Cause Conditions Likely to Threaten Institutional Security."  Ouye Decl., at 20, 24-25.

12 According to the Rules Violation Report ("RVR"), at the February 26, 2003, Classification

13 Committee hearing where Plaintiff's cell status was evaluated, Plaintiff stated that if he was

14 forced to double cell, "that he would hurt or kill his cellmate."  Ouye Decl., at 24.

15 Plaintiff did not want to be double-celled.  Pl.'s Decl. ¶ 35.

16 Moving to double cell is recommended by CDCR policy for all inmates, when possible.

17 Lopez Decl. ¶ 9.

18 The RVR was revised to reflect a specific act of "Threatening to Kill or Hurt A

19 Cellmate."  Ouye Decl., at 24.[6]  Changing the "specific act" description on the RVR did not

20 change the nature of the offense.  Lopez Decl. ¶ 5.  Both offenses are classified as Division F

21 offenses and are punishable by a thirty-day credit forfeiture.  Lopez Decl. ¶ 6.[7]

22

23

24 [6] The parties dispute who initialed the change.  The RVR shows initials of "D.C." and a date of March 4, 2003.
Ouye Decl., at 24. Plaintiff contends that Defendant Lopez changed the RVR, though Defendants state that "D.C." is

25 Defendant Chapman.  As there was no difference is punishment, the dispute is not material.

26 [7] Plaintiff contends that the new charge is punishable by a SHU term, in addition to a thirty-day credit forfeiture.
Pl.'s Decl. ¶ 34.  However, Plaintiff does not cite evidence to support his statement.  He cites Exhibit 12, but there is

27 no Exhibit 12 attached to his opposition.  He also cites Exhibit 10, but Exhibit 10 is a letter from the Kern County
Grand Jury dated June 6, 2001.  Therefore, the fact that both offenses are subject to the same punishment is

28 undisputed.

1    On March 6, 2003, Plaintiff attended an Institutional Classification Committee ("ICC")

2   hearing.  Ouye Decl., at 29.  The Chrono is signed by Defendant Todd, as chairperson, and D.A.

3   White.  Ouye Decl., at 29.[8]  Pursuant to the hearing, Plaintiff was retained in Ad-Seg pending

4   resolution of the RVR.

5    Neither Defendant Todd, nor the Committee, has the power to unilaterally commit an

6   inmate for mental health treatment.  Todd Decl. ¶¶ 7, 10, 11.  Rather, decisions regarding mental

7   health treatment were made by the Interdisciplinary Treatment Team ("IDTT").  Todd Decl. ¶ 9.

8   If IDTT determines that an inmate should be referred to a different level of care for mental health

9   treatment, the inmate would return to ICC to determine the appropriate institution for transfer.

10   Todd Decl. ¶ 10.

11    On March 20, 2003, Plaintiff attended a hearing on the RVR.  Plaintiff was found guilty

12   of the lesser charge of "Conduct Which Could Lead to Violence."  He was found not guilty of

13   "Threat to Use Force or Violence Against the Person of Another."  Plaintiff was assessed a

14   thirty-day credit forfeiture for this Division F-3 offense.  Ouye Decl., at 25-26.

15   *Count Ten*

16    Plaintiff filed an appeal against Defendants Todd, Lopez and Chapman (CCI-7-03-

17   01110).  Pl.'s Decl. ¶ 40.

18    Plaintiff had a Committee meeting on April 3, 2003, but he did not attend.  Ouye Decl., at

19   31.  In absentia, the Committee decided to refer Plaintiff for release back to General Population.

20   Ouye Decl., at 31.  He was retained in Ad-Seg, however.  Ouye Decl., at 31.

21    Defendant Matzen interviewed Plaintiff on April 22, 2003, regarding the appeal.   Matzen

22   Decl. ¶ 3.

23   *Count Eleven*

24    On April 21, 2003, S. Hopkins prepared a Form CDC 114-D lockup order.  The form

25   states that on April 3, 2003, Plaintiff was released to the general population.  However, Plaintiff

26   refused several direct orders to exit his cell and stated that he had safety concerns.  Plaintiff was

27

28   _____

[8]  The parties dispute which officer chaired the March 6, 2003, hearing.  Again, the dispute is not material.

1   therefore retained in Ad-Seg pending an ICC review to determine his future housing and

2   program needs.  Ouye Decl., at 32.

3       Plaintiff did not want to leave Ad-Seg and return to the general population.  Pl.'s Dep.

4   55:24-25.

5   **IV.    DISCUSSION**

6       A.    Legal Standard

7       Allegations of retaliation against a prisoner's First Amendment rights to speech or to

8   petition the government may support a section 1983 claim.  *Rizzo v. Dawson*, 778 F.2d 527, 532

9   (9th Cir. 1985); *see also Valandingham v. Bojorquez*, 866 F.2d 1135 (9th Cir. 1989); *Pratt v.*

10  *Rowland*, 65 F.3d 802, 807 (9th Cir. 1995).  "Within the prison context, a viable claim of First

11  Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some

12  adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that

13  such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did

14  not reasonably advance a legitimate correctional goal."  *Rhodes v. Robinson*, 408 F.3d 559, 567-

15  68 (9th Cir. 2005*); accord Watison v. Carter*, 668 F.3d 1108, 1114-15 (9th Cir. 2012); *Brodheim*

16  *v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009).

17      B.    Analysis

18          1.    *Counts One and Two*

19      Counts One and Two allege that Defendants Pazo, Tidwell and Wenciker searched

20  Plaintiff's cell and confiscated his property in retaliation for the lawsuit he filed against them.

21      There is no dispute that Plaintiff's cell was searched and that property was taken.  Rather,

22  the only dispute relates to whether Defendants' actions were taken *because of* Plaintiff's filing of

23  this action.

24      Plaintiff alleges that he placed the complaint in the prison's legal mail box on December

25  26, 2001.  The searches at issue occurred on January 2 and 3, 2002, long before the complaint

26  was served on any Defendant.

27

28

1    Defendants contend that they had no way of knowing the contents of legal mail.  Pursuant

2    to procedure, inmates would shake an envelope before it was sent, in front of an officer, then seal

3    the envelope in the officer's presence.  The officer would sign and date the seal.  Pazo Decl. ¶ 8.

4    Defendants Pazo, Wenciker and Tidwell state that they do not recall having any

5    knowledge of Plaintiff's lawsuit in January 2002.  Pazo Decl. ¶ 6; Wenciker Decl. ¶6; Tidwell

6    Decl. ¶ 6.

7    In his opposition, Plaintiff argues that the prison mailbox is attached to the door of the

8    office belonging to Defendants Pazo, Tidwell and Wenciker.  Pl.'s Decl. ¶ 4.  He agrees that they

9    would have had no way of knowing the contents of his mail, but argues that Defendants had been

10   known to tamper with inmates' legal mail.  Plaintiff argues that correctional officers had a

11   "custom or policy" of tampering with an inmate's legal mail.  Pl.'s Decl. ¶ 12.

12   Plaintiff's generalization about the actions he *thinks* Correctional Officers take, without

13   supporting evidence, is insufficient to demonstrate the existence of a genuine dispute of fact.  To

14   support his belief, Plaintiff cites to the Declaration of Inmate Kirkton Moore.  Pl.'s Decl., Ex. 2.

15   Inmate Moore states that he filed a complaint with the Kern County Grand Jury contending that

16   CCI staff withheld his mail.  This does not, in any way, suggest that Defendants Pazo, Tidwell

17   and Wenciker had knowledge of Plaintiff's lawsuit when they searched his cell on January 2 or

18   3, 2003.

19   However, Plaintiff also states in both his TAC and in declaration, that when Defendants

20   Pazo, Tidwell and Wenciker went to his cell on January 2, 2002, they questioned him about the

21   lawsuit he had just filed.  Plaintiff states that he denied that he had filed a lawsuit out of fear, and

22   Defendants then searched his cell for a copy of the complaint.  Plaintiff surmises that because

23   they could not find a copy, they confiscated some of his personal property.

24   Plaintiff's statements in his verified TAC and his declaration are sufficient to create a

25   genuine dispute of fact as to whether Defendants Pazo, Tidwell and Wenciker were aware of the

26   lawsuit when they searched Plaintiff's cell on January 2 and/or 3, 2002.

27

28

12

1   Defendants also argue that Plaintiff cannot show that there were no legitimate

2   penological purposes for the searches and/or confiscations.  However, other than citing general

3   rules about allowable property, Defendants do not state that Plaintiff's property was

4   unauthorized.  Brice Decl., Ex. B, C.  In his declaration, Plaintiff states that his property was less

5   than the allowable six cubic feet.  Plaintiff also attaches a copy of Cell Search Receipt for

6   January 2, 2002, to his opposition.  The receipt indicates that "unauthorized elect. devices" were

7   found, though the list of items confiscated is illegible.  Pl.'s Opp'n, Ex. 1.

8   Plaintiff's statement that his property was authorized, as well as his contention that the

9   Cell Search Receipt was a pretext for the retaliatory search, creates a dispute of fact as to

10   whether there was a legitimate penological purpose behind the searches at issue.

11   Accordingly, the Court recommends that Defendants' motion for summary judgment be

12   denied as to Counts One and Two.

13   2.   *Count Three*

14   In Count Three, Plaintiff alleges that Defendant Lopez fired him from his job as a SHU

15   Legal Clerk in retaliation for filing the lawsuit.

16   Defendants argue that Plaintiff cannot show that an adverse action was taken against him

17   because the evidence demonstrates that he was not fired.  Defendants rely on the UCC Chrono

18   dated February 13, 2002, which states that Plaintiff was to "Continue Assignment: ASU Legal

19   Clerk."  Ouye Decl., at 8.  Relying on the Second Level response to Plaintiff's related appeal,

20   Defendants contend that Plaintiff was not called to work after the UCC hearing because his

21   supervisor was injured and did not report to work.  Also pursuant to the response, Defendants

22   contend that at the hearing, it was discovered that Plaintiff, a general population inmate,

23   continued to work in the SHU despite a prior institution-wide decision to preclude general

24   population inmates from working in either the SHU or Ad-Seg.  The response states that due to

25   this policy, Plaintiff's "current job assignment has been relocated to the General Population

26   Library area where he will assist the SHU Legal Officer."  Ouye Decl., at 47-48; Todd Decl. ¶¶ 3,

27   4.

28

1    Plaintiff disputes this, contending that Defendant Lopez told him during the UCC hearing

2    that he was fired, without explanation.  Pl.'s Decl. ¶ 14.  While this disputes whether Plaintiff

3    was actually fired or not, Plaintiff cannot demonstrate that Defendant Lopez had knowledge of

4    the lawsuit at the time of the hearing.[9]

5    Plaintiff alleges that on January 4, 2002, Officers Blevins and Robinson intercepted mail

6    from this Court "when the Court returned to [him his] ten additional copies of the suit."  Pl.'s

7    Decl. ¶ 13.  Plaintiff then alleges that Officers Blevins and Robinson shared the lawsuit with

8    Defendant Lopez.  Pl.s Decl. ¶ 13.  However, as the Court explained when it dismissed Officers

9    Blevins and Robinson from this lawsuit, the docket shows that this Court did not send Plaintiff

10   any documents prior to February 12, 2002, when it ordered Plaintiff to submit an application to

11   proceed in forma pauperis or pay the filing fee.  ECF No. 7; ECF No. 254, at 18.  In fact, this

12   Court did not even receive Plaintiff's lawsuit until January 4, 2002, and it was not entered into

13   the docket until January 8, 2002.  ECF No. 1.  Moreover, the Court would not have sent Plaintiff

14   ten copies of his complaint immediately after filing.  Plaintiff cannot defeat summary judgment

15   with allegations that are patently false.[10]

16   The Court recommends that summary judgment be granted in favor of Defendant Lopez

17   on Court Three.

18          3.      *Count Six*

19   In Count Six, Plaintiff alleges that Defendant Chapman put him up for transfer to another

20   institution in retaliation for filing a grievance against Defendant Lopez.  TAC, at 6.  He also

21   alleges that Defendant Chapman brought him to committee on January 8, 2003, for the sole

22   purpose of removing him from his job assignment.  TAC, at 6.

23   Addressing the transfer, Defendants allege that the transfer was not adverse because

24   Plaintiff would be moved to a less-restrictive environment and would be closer to his mother.

25

26   [9] The Court notes that Plaintiff's theory that the supervisor was actually transferred and that Defendants' explanation is therefore untrue, is insufficient to create a dispute of fact.

27   [10] The Court recognizes that on summary judgment, it cannot determine the credibility of evidence.  However, where the evidence is contradicted by the Court's own docket, and Plaintiff makes no claim that the docket is incorrect, Plaintiff's claim cannot defeat summary judgment.

28

Defendants also contend that at the time, CCI needed bed space in the 180 unit, and the UCC is obligated by departmental policy to move inmates to less restrictive housing when possible. Chapman Decl. ¶¶ 5-8, 10.  In any event, Defendants argue, the transfer was ultimately cancelled.

Plaintiff attempts to avoid summary judgment by setting forth his view as to why he thinks the transfer was retaliatory.  Plaintiff states that he was considered 270 his entire time at CCI, and therefore the 180-270 distinction is pretextual.  Pl.'s Decl. ¶ 21.  He also opines that for him, no freedom of movement was more valuable than the unobstructed access to the courts that his job provided.  Each year, he was given a choice of transferring or remaining at CCI.  Plaintiff always elected to stay at CCI because of his job.  Pl.'s Decl. ¶¶ 23-24

Despite Plaintiff's beliefs, he fails to present sufficient evidence to demonstrate that the transfer was retaliatory.  First, while Plaintiff may have liked to stay at CCI because of his job, the fact remains that the proposed transfer was to a less-restrictive setting.  In other words, Plaintiff's disagreement does not make an otherwise favorable action adverse.

Second, Plaintiff fails to set forth evidence to show that the transfer was not related to a legitimate penological purpose.  Plaintiff suggests that Defendant Chapman had a retaliatory motive, but he fails to dispute the fact that CCI needed space in its 180 housing unit.  Plaintiff attempts to call the motive into question by arguing that he was a 270 inmate the entire time he was incarcerated at CCI, but this also fails to acknowledge the space issue that had arisen at CCI.

Moving to Plaintiff's allegation that Defendant Chapman attempted to remove him from his job assignment in January 2003, Defendants argue that a regular job rotation was not an adverse action.  They also argue that pursuant to policy, clerks are subject to a nine month job rotation to prevent inmates from becoming too familiar with any one position.  Chapman Decl. ¶ 16.

Plaintiff again attempts to avoid summary judgment by setting forth his beliefs as to why the rotation was pretextual.  Plaintiff states that he was the SHU Legal Clerk from December 26, 1997, through February 13, 2003, and was not subject to rotation during this period.  Pl.'s Decl.

¶¶ 28, 31.  He also states that another inmate had been there for "years before [him]."  Pl.'s Decl. ¶ 29.

Plaintiff's beliefs, however, remain insufficient to create a genuine dispute of material fact.  While Plaintiff may have liked to remain in his job position, his reassignment was not an adverse action.  Moreover, even though Plaintiff, or another inmate, may not have been rotated for a number of years prior to February 2003, the subsequent enforcement of the policy alone does not support a finding of retaliatory motive.  This is especially true where Plaintiff was retained in the highest work/privilege group.

Accordingly, the Court recommends that summary judgment be granted in favor of Defendant Chapman on Count Six.

### 4.    *Count Eight*

Plaintiff alleges that Defendant Lopez, during the March 6, 2003, hearing, told him that he reclassified the specific act of the RVR.  He also contends that during the same hearing, Defendant Todd threatened to transfer him to a psychiatric facility if he kept filing grievances.

It is undisputed that changing the "specific act" did not change the nature of the offense and, more importantly, did not increase the possible punishment.  Accordingly, there was no adverse action and the Court recommends that summary judgment be entered in favor of Defendant Lopez on Count Eight.

Turning to Defendant Todd's alleged threat, there is a genuine dispute of material fact as to whether Defendant Todd made the alleged threat.  Todd Decl. ¶ 6, Pl.'s Decl. ¶ 36.

Defendants argue, however, that Defendant Todd did not have the authority to commit Plaintiff.  Whether or not Defendant Todd could follow through on his alleged threat, however, is irrelevant because Plaintiff believed that he could so do.  Defendants also suggest that being referred for mental health treatment "would be to the inmate's benefit," but there is no suggestion here that Plaintiff needed mental health treatment.

The Court therefore recommends that summary judgment be denied as to Defendant Todd on Count Eight.

1          5.      *Count Ten*

2          In Count Ten, Plaintiff alleges that Defendants Garza and Matzen came to his Ad-Seg

3   cell on April 3, 2003, and tried to intimidate him into withdrawing his appeal against Defendants

4   Lopez, Todd and Chapman.  Pl.'s Dec. ¶ 40.  He also alleges that because he refused to withdraw

5   the appeal, Defendant Lopez came to his cell and threatened physical harm and a cell search.

6   Pl.'s Decl. ¶ 41.  Defendant Lopez threatened to drag Plaintiff out of his cell, and told him that

7   he was taking him back to Committee and putting him up for a transfer.[11]  Pl.'s Decl. ¶ 41.

8          While Defendants Garza and Matzen do not specifically dispute this, they state that they

9   do not remember the encounter.  Matzen Decl. ¶ 2; Garza Decl. ¶ 2.

10         Defendants first argue that Plaintiff "admits" that nothing happened other than a verbal

11  exchange.  Defs.' Mot., 10.  Defendants appear to be suggesting that a mere "verbal exchange"

12  does not rise to the level of an adverse action.  However, while Plaintiff agrees that only a

13  "verbal exchange" occurred, he contends that this exchange caused fear and a belief that they

14  would put someone into his cell to hurt him.  He contends that his chilled his First Amendment

15  rights.[12]  Pl.'s Decl. ¶ 42.  Plaintiff's allegations are sufficient to create a dispute of fact.

16         Defendants also state that Defendants Matzen and Garza were Ad-Seg sergeants and

17  often informally interviewed an inmate to see if the appeal could be resolved prior to a formal

18  appeal.  Garza Decl. ¶¶ 3-4; Matzen Decl. ¶ 4.  Defendants suggest that this "could have" been

19  the reason for the visit.  Defs.' Mot., 11.  They also point out that Plaintiff admits that his cell

20  can be searched at any time.  Pl.'s Decl. ¶ 50.  However, in light of Plaintiff's allegations and the

21  dispute of fact as to whether their actions were adverse, Defendants facts do not render the

22  legitimate penological issue undisputed.

23         As to Plaintiff's allegations that Defendant Lopez took him back to Committee for

24  retaliatory reasons, the parties dispute the reasons behind the hearing.  The parties also dispute

25  

---

26  [11] Plaintiff appears to be complaining about a retaliatory transfer and release to the general population.

27  [12] Defendants point out that the appeal was actually processed, though this is irrelevant in determining whether
    Defendants Garza and Matzen chilled Plaintiff's First Amendment rights as to future appeals.  To the extent that
28  Defendants argue that because the appeal was processed, Defendants did not have a retaliatory motive, their
    argument fails.

1   whether returning Plaintiff to the general population would be an adverse action.  Plaintiff

2   believes that the hearing was retaliatory and was meant to return Plaintiff to the general

3   population, where he would be subject to additional retaliation and double-celling.  Defendants

4   contend that a return to general population would not be an adverse action, given that Plaintiff

5   would be in a less-restrictive environment.

6           The Court finds that Plaintiff has created a dispute of fact as to Defendant Lopez's threat

7   to take Plaintiff back to Committee.  While the Court earlier determined that transfer to another

8   institution was not an adverse action, the same cannot be said for transfer *within* the institution-

9   where the threat of retaliation by Defendants remains.

10          Accordingly, the Court recommends that Defendants' motion for summary judgment on

11  Count Ten be denied.

12                        6.      *Count Eleven*

13          Plaintiff alleges that on April 4, 2003, Defendant Lopez had S. Hopkins fabricate a

14  lockup order.  The order retained Plaintiff in Ad-Seg because he refused direct orders to exit his

15  cell after he had been released to the general population.

16          The parties dispute the facts underlying the lockup order, i.e., whether Plaintiff refused

17  orders to exit his cell.  Regardless of the underlying facts, Defendants argue that there is no

18  adverse action because Plaintiff was ultimately retained in Ad-Seg, a result that he desired.

19  However, Plaintiff's allegation focuses on the facts that led to the lockup order, not the ultimate

20  result.  Indeed, Plaintiff alleges that the false allegations ultimately led to a guilty finding on the

21  related RVR.

22          The Court finds that a dispute of fact exists as to whether this was an adverse action taken

23  because of Plaintiff's grievance.[13]  Accordingly, the Court recommends that summary judgment

24  on Count Eleven be denied.

25

26

27  ---
[13] In arguing that the lockup order was false, Plaintiff contends that S. Dunlap later told him that he learned that staff had not given any direct orders.  Pl.'s Decl. ¶ 48.  This is hearsay, however, and was not considered in the Court's

28  analysis.

**V.      FINDINGS AND RECOMMENDATIONS**

Based on the above, the Court HEREBY RECOMMENDS that Defendants' motion for summary judgment, filed on August 5, 2013, be GRANTED IN PART AND DENIED IN PART as follows:

1.      Defendants' motion for summary judgment on Counts One and Two against Defendants Pazo, Tidwell and Wenciker be DENIED;

2.      Defendants' motion for summary judgment on Count Three against Defendant Lopez be GRANTED;

3.      Defendants' motion for summary judgment on Count Six against Defendant Chapman be GRANTED, and that Defendant Chapman be DISMISSED from this action;

4.      Defendants' motion for summary judgment on Count Eight be GRANTED against Defendant Lopez and DENIED against Defendant Todd;

5.      Defendants' motion for summary judgment on Count Ten against Defendants Lopez, Garza and Matzen be DENIED; and

6.      Defendants' motion for summary judgment on Count Eleven against Defendant Lopez be DENIED.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within THIRTY (30) days after being served with these Findings and Recommendations, the parties may file written objections with the Court.  Local Rule 304(b).  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **September 2, 2014**            /s/ *Dennis L. Beck*
                                                    UNITED STATES MAGISTRATE JUDGE